The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CONTINENTAL WESTERN INSURANCE COMPANY, a foreign corporation,<br><br>      Plaintiff,<br><br>  v.<br><br>LEXINGTON INSURANCE COMPANY, a foreign corporation,<br><br>      Defendant. | Case No. C09-1112 MJP<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION TO STRIKE** |

  This matter comes before the Court on Defendant's motion for summary judgment on its duty to settle. (Dkt. No. 28.) Having reviewed the motion, Plaintiff's response (Dkt. No. 31), Defendant's reply (Dkt. No. 36), and all papers submitted in support thereof, the Court DENIES the Defendant's motion for the reasons set forth below. In response to Defendant's reply, Plaintiff filed a surreply, asking the Court to strike the declaration of Neal J. Philip. (Dkt. No. 40.) The Court GRANTS the request to strike and has not considered the supplemental declaration submitted by Philip.

///

///

**Background**

This action arises from the on-the-job death of Richard Collins ("Collins"), an employee of Bulldog Demolition & General Contracting ("Bulldog"), on October 6, 2003. (Compl. ¶¶ 5-6.) At the time of Collins' death, Bulldog was subcontracting for Ketchikan Drywall Services, Inc. ("Ketchikan"). (Id. ¶¶ 4-6.) Both Lexington Insurance Company ("Lexington or Defendant") and Continental Western Insurance Company ("Continental" or "Plaintiff") insured Ketchikan under a $1,000,000 "each occurrence" limits. (Verfurth Decl., Ex. 1 at 4; Ex. 3 at 4.)

On June 7, 2005, Collins' estate ("Estate"), Collins' wife, Barbara Collins, and their son filed in King County Superior Court a survivorship and wrongful death action against Ketchikan and other defendants. (Compl., ¶ 11; Dkt. No. 28 at 3; Dkt. No. 31 at 2-3.) Continental retained Irving "Buddy" Paul to represent both Continental and Ketchikan and then tendered the claim to Lexington. (Dkt. No. 28 at 3; Verfurth Decl., Ex. 2.) On July 26, 2005, Lexington agreed under a reservation of rights to defend Ketchikan and retained Martens + Associates PS ("Martens") to represent Ketchikan. (Dkt. No. 28 at 3; Verfurth Decl., Ex. 3.) After Martens stepped in, Paul's role was "to monitor the situation but not become actively involved . . . ." (Verfurth Decl., Ex. 14 at 3.)

Throughout the underlying case, Martens regularly sent Lexington reports that included evidentiary updates, litigation plans, and estimated exposure amounts. In April and May, 2007, Martens approximated Ketchikan's apportionment of fault to be between 35% and 50% with a net exposure of $262,500 to $475,000. (Verfurth Decl., Ex. 11 at 16; Ex. 12 at 3.) By late August and before the parties engaged in any settlement negotiations, Martens believed liability was held between Collins and three entities, including Ketchikan. (Verfurth Decl., Ex. 5 at 12.) Martens also discovered that Collins was a convicted pedophile whose drug use may have contributed to his death. (Verfurth Decl., Ex. 5 at 15, 17-18.) With this new information, Martens estimated Ketchikan's net exposure to be between $162,500 and $230,000. (Id. at 22.) On August 23, 2007, Martens and the Estate participated in an unsuccessful mediation with

mediator Larry Levy ("Levy").  (Verfurth Decl., Ex. 13 at 2.)  No Lexington representatives were present.  (See Smith Decl., Wittman Dep. at 16; Ex. 12 at 11.)  Martens offered $10,000 on behalf of Ketchikan, the Estate's lowest demand was $2,000,000, and the mediator assessed the case at $500,000.  (Verfurth Decl., Ex. 13 at 3.)  Following Martens' recommendation, Lexington never responded to the $2,000,000 offer.  (Verfurth Decl., Ex. 13 at 3; Dkt. No. 31 at 6.)

Mrs. Collins and her son dismissed their wrongful death actions against Ketchikan on January 15 and 22, 2008, respectively.  (Smith Decl., Exs. 7, 8.)  On January 17, 2008, Martens asked Levy to find out if the Estate was interested in meeting with a structured settlement representative.  (Verfurth Decl., Ex. 22 at 3.)  The Estate's attorney claims he was "never contacted" about this meeting.  (Mitchell Decl. ¶ 6.)

Trial began January 22, 2008, and deliberations began February 13, 2008.  (Dkt. No. 31 at 8; Smith Decl., Ex. 12 at 6.)  On February 8, 2008, Lexington valued the case at $350,000.  (Smith Decl., Ex. 12 at 7.)  Martens disagreed with this evaluation and, with Lexington's permission, offered the Estate $250,000 to settle the case.  (Id.; Mitchell Decl., Ex. 2.)  The Estate rejected the offer.  (Verfurth Decl., Ex. 23.)  On February 12, 2008, Martens, upon Lexington's request, offered $350,000.  (Mitchell Decl., Ex. 3.)  The Estate also rejected this offer.  (Smith Decl., Ex. 12 at 6.)  On February 15, 2008, the jury returned a $4,553,270.20 verdict against Ketchikan.  (Dkt. No. 28 at 2; Dkt. No. 31 at 3.)  Post-verdict, Lexington tendered its $1,000,000 policy limit to Continental, which took over Ketchikan's defense.  (Dkt. No. 28 at 2.)  The parties settled for $3,400,000.  (Id.)

On June 29, 2009, Continental brought an equitable subrogation claim against Lexington, asserting Lexington (1) breached its obligation of good faith and fair dealing by failing to make reasonable settlement offers, (2) was negligent in failing to take reasonable steps to settle Ketchikan's claim, and (3) violated the Washington State Consumer Protection Act.  (Compl. ¶¶ 23-32.)  Lexington moves for summary judgment on the issue of its duty to settle, asking the

ORDER DENYING DEFENDANT'S MOTION FOR  
SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S  
MOTION TO STRIKE - 3

CASE NO. C09-1112 MJP

1  Court to find that Lexington acted reasonably and in good faith in evaluating the underlying

2  insurance claim. (Dkt. No. 28.) In addition to its initial evidence, Lexington filed 180 pages of

3  evidence with its reply brief. (Dkt. No. 36.) Continental moves to strike one of the declarations,

4  its exhibits, and all references to the declaration. (Dkt. No. 40.)

**Analysis**

A.  Summary judgment standard

"Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Nor is summary judgment warranted if a material issue of fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. Id. at 324.

B.  Insurers' duty to settle

Washington insurers have a broad obligation to "deal fairly with an insured, giving equal consideration in all matters to the insured's interests." Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 386 (1986) (emphasis in original). Within this broad obligation is the narrower duty to settle, which arises when investigations disclose liability on the part of the insureds. See Truck Ins. Exch. of Farmers Ins. Group v. Century Indem. Co., 76 Wn. App. 527, 534 (1995)

ORDER DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S
MOTION TO STRIKE - 4

CASE NO. C09-1112 MJP

(citing Hamilton v. State Farm Ins. Co., 83 Wn.2d 787, 791-92 (1974)).  The duty to settle "includes 'an obligation at least to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available and make an informed evaluation of the settlement demand." Truck Ins., 76 Wn. App. at 534 (citations omitted).  An insurer must conduct these negotiations "as though it bore the entire risk, including any judgment in excess of the policy limits." Id.  Factors that may affect "the 'good faith' posture of the insurer" include lack of a proper evaluation, the severity of the underlying injury and the strength of the claimant's case, each party's financial risk, rejection of the attorney's or agent's advice, the flat refusal to negotiate, and a demonstrated receptive climate for settlement.  See Tyler v. Grange Ins. Ass'n, 3 Wn. App. 167, 174, 179 (1970).

An insurer may be liable for "failure to settle within [its insured's] policy limits if that failure is attributable to either bad faith or negligence." Id. at 175 (footnote omitted).  Although there can be individual tests for negligence and bad faith claims, "there is a tendency for the two concepts to be fused and to give rise to a joint or consolidated standard" because they are "to some extent merely the two faces of the same coin." Hamilton, 83 Wn.2d at 792.  Even states that reject negligence claims agree that "negligence is a relevant consideration in determining whether or not an insurer exercised the requisite good faith." Id.  Whether an insurer acted in good faith is a question of fact.  Smith v. Safeco Ins. Co., 150 Wn.2d 478, 484 (2003).

1. Investigation

It is undisputed that Lexington, through Martens, conducted an investigation of Ketchikan's claim.  See Tyler, 2 Wn. App. at 174; see also Burnham v. Commercial Cas. Ins. Co., 10 Wn.2d 624, 635 (1941) (finding evidence of good faith when "both parties had full knowledge of all the facts.").  Martens investigated the details of Collins' accident and ensuing death, retained expert witnesses to support Ketchikan's position, and kept Lexington informed of all relevant information through regular status reports.  (See Verfurth Decl., Exs. 5-7, 9-11, 13,

20, 22.) Even though Lexington's thorough investigation is evidence of good faith and reasonableness, it is insufficient on its own to support summary judgment.

2. <u>Negotiations</u>

Lexington contends that it acted reasonably and in good faith as a matter of law in evaluating and negotiating Ketchikan's claim and, as a result, it cannot be held liable for the final settlement amount. (<u>See</u> Dkt. No. 28 at 10.); <u>see also</u> <u>Burnham</u> 10 Wn.2d at 634 ("A mistake of judgment is not bad faith.") The Court disagrees. Lexington's evidence that it acted in accordance with its duty to settle is at odds with Continental's evidence that Lexington may have acted unreasonably and in bad faith. There is thus a material issue of fact that precludes summary judgment.

Lexington's attempts at settlement are some evidence of good faith. <u>See</u> <u>Tyler</u> 3 Wn. App. at 170-72, 179. In August, 2007, Lexington provided money for a mediation in which Ketchikan offered $10,000. (Verfurth Decl., Ex. 13 at 3.) Approximately one week before trial, Lexington contacted Levy in an attempt to engage in a structured settlement conference with the Estate. (Verfurth Decl., Ex. 25 at 3.) During trial, Lexington offered the Estate $250,000. (Mitchell Decl., Ex. 2.) Upon rejection of the previous offer, Lexington offered $350,000. (Mitchell Decl., Ex. 3.) Lexington defends these negotiation tactics with its informed evaluation of the case. Not only did Lexington believe the accident was Collins' "fault entirely," but Martens was also confident that Collins' past, paired with his conduct on the day of the accident, would significantly reduce Ketchikan's liability. (Smith Decl., Wittman Dep. at 23; <u>see e.g.</u>, Verfurth Decl., Ex. 5 at 21 ("We anticipate that up to 40% of the total fault will be allocated to Mr. Collins for his contributory negligence.").) These beliefs led Lexington and Martens to value the case between $127,500 and $500,000. (Dkt. No. 28 at 4; Smith Decl., Wittman Dep. at 8-9.)

Lexington also asserts the Estate created a settlement climate that was not conducive to settlement . (Dkt. No. 28 at 18.); <u>see</u> <u>Tyler</u>, 3 Wn. App. at 179. Lexington argues that the Estate

1  never offered an amount within Ketchikan's policy limit, refused to enter into a structured
2  settlement conference before trial, and flatly rejected Lexington's two offers during trial.
3  (Verfurth Decl., Ex. 8 at 2-3; Ex. 22 at 3.)

4   Despite Lexington's proffer, Continental offers evidence that creates issues of fact as to
5  whether it was reasonable and in good faith for Lexington to evaluate the case at less than
6  $500,000, as well as whether the Estate demonstrated a receptive settlement climate.  The Estate
7  requested $5,000,000 in general damages and opened with that amount at mediation.  (Verfurth
8  Decl., Wittman Dep. at 2; Ex. 5 at 19.)  Regardless of Ketchikan's policy limit or Lexington's
9  evaluation of the case, Lexington was required to negotiate as if it bore the risk of the entire
10 $5,000,000.  See Truck, 76 Wn. App. at 534.  However, knowing both that a plaintiff verdict was
11 likely and that the plaintiff requested this significant amount of money, Lexington never offered
12 more than $350,000 and waited a significant period of time before making that offer.  (See, e.g.,
13 Verfurth Decl., Ex. 5 at 21; Mitchell Decl., Ex. 3.)  This scenario parallels Hamilton, where the
14 court held the insurer's good faith was properly submitted to the jury when the plaintiff,
15 requesting $100,000 in damages, was granted a new trial, and the insurer failed to settle despite a
16 $10,000 policy limit.  83 Wn.2d at 788, 794.  In addition to the Estate's demand, Martens
17 advised Lexington that "the pain and suffering claim does have significant value" and Lexington
18 knew the jury would likely see the gruesome post-mortem pictures.  (Verfurth Decl., Ex. 5 at 19;
19 Ex. 7 at 5).  Barbara Collins planned on testifying that seeing her husband in the hospital "was
20 the most hideous thing [she'd] ever seen in [her] life." (Verfurth Decl., Ex. 5 at 17.)  This
21 evidence weighed against Ketchikan and supported a potential verdict exceeding the policy limit.
22 Reasonable minds could differ on whether Lexington reasonably and in good faith relied on
23 these harmful facts when it negotiated Ketchikan's claim.

24   Continental also offers evidence to support the Estate's willingness to settle.  Not only
25 did the Estate lower its opening demand at mediation by more than fifty percent (Dkt. No. 31 at
26 6), but Martens also informed Lexington that "plaintiffs' settlement position has apparently

ORDER DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S
MOTION TO STRIKE - 7

CASE NO. C09-1112 MJP

dropped from $2 million to less than $1 million," (Verfurth Decl., Ex. 25 at 3.)  There is no evidence that Lexington contacted the Estate directly to inquire about this alleged drop.  Further, Mrs. Collins asserts that she "would have seriously considered a settlement offer below $500,000 if it had been made at a reasonable time," and Mitchell corroborates this with his statement that both Mrs. Collins and Mitchell would have been satisfied with and accepted $500,000.  (Collins Decl. at 2; Mitchell Decl. at 2.)  Because Lexington never elicited this low settlement position from the Estate, there is a question as to whether Lexington's negotiations were "sufficient to ascertain the most favorable terms available," as the law requires.  See Truck, 76 Wn. App. at 534.

### 3. Reliance on counsel

Lexington contends that its reliance on Martens establishes good faith and reasonableness as a matter of law.  (See Dkt. No. 28 at 1); see Tyler, 3 Wn. App. at 174.  While evidence of reliance may be evidence of good faith, see Bohemia, Inc. v. Home Ins. Co., 725 F.2d 506, 512 (9th Cir. 1984), it is not enough to permit this Court to rule as a matter of law that Lexington acted reasonably and in good faith.  Rather, Lexington's reliance on counsel is one factor the trier of fact may consider when determining whether it has acted in good faith.

## C. Motion to strike

Plaintiff requests the Court strike (1) the declaration of Neal J. Philip in Support of Lexington Insurance Company's Reply in Support of Motion for Summary Judgment (Dkt. No. 37), (2) all exhibits attached thereto, and (3) all references to the declaration and its exhibits.  (Dkt. No. 40.)  The Court GRANTS Plaintiff's request and strikes the evidence.

A district court should not consider evidence submitted with a reply brief "without giving the [non-]movant an opportunity to respond."  Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (considering evidence submitted both in the reply and in the non-movant's supplemental declaration).  Here, Lexington offered 180 pages of evidence with its reply brief.  According to the dates of the exhibits, almost all of this information was available to Lexington prior to filing

its motion.  (See e.g., Philip Decl. at 2) (the deposition of David Mandt was taken on March 12, 2010.)  It was improper for Lexington to file this evidence in a brief to which Continental could not respond.  The Court strikes the declaration of Neal J. Philip.

**Conclusion**

The Court DENIES Lexington's motion for summary judgment and GRANTS Continental's motion to strike.  First, there is a genuine issue of material fact as to whether Lexington acted reasonably and in good faith in its evaluation of and its attempts to settle Ketchikan's underlying case.  Second, Lexington should have submitted all of its evidence with its motion for summary judgment rather than with its reply brief.

The Clerk shall transmit a copy of this Order to all counsel of record.

Dated this 14th day of May, 2010.

Marsha J. Pechman
United States District Judge